## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIE JAMES MILES, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:14-CV-01888-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On April 29, 2011, the claimant, Willie James Miles, Jr., applied for disability insurance

benefits and supplemental security income under Title II and Title XVI of the Social Security

Act, respectively.  The claimant alleges disability commencing on February 1, 2009, resulting

from mitral valve prolapse, high blood pressure, dysautonomia,[1] anxiety, brain surgery, and

headaches.[2] (R. 208). On July 7, 2011, the Commissioner denied both applications. The claimant

timely requested a hearing before an Administrative Law Judge ("ALJ"), and the ALJ held a

video hearing on February 13, 2013. On March 8, 2013, the ALJ determined that the claimant

was not disabled as defined by the Social Security Act, and, thus, not eligible for disability

---

[1]  Dysautonomia is a term for various conditions in which the autonomic nervous system does
not work correctly.

[2]  The Claimant's disability application lists a disability onset date of February 1, 2009. (R. 51).
At the claimant's hearing, however, the claimant's attorney moved to amend the onset date to the
filing date for the claimant's disability claim on April 29, 2011. (R. 74). Nevertheless, the ALJ's
decision uses the February 1, 2009 onset date for determining eligibility. (R. 51). However,
because this court finds neither date dispositive of the claimant's eligibility in this case, any error
in listing the onset date as February 1, 2009 instead of April 29, 2011 is harmless.

1

insurance benefits or supplemental security income.

On August 7, 2014, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this Court has jurisdiction pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: 1) whether substantial evidence supports the ALJ's finding that the claimant did not suffer a severe impairment from an alleged seizure disorder; and 2) whether the ALJ erred in according the proper weight to the opinions of the claimant's treating and consultative physicians, Dr. Estock, Dr. Novack, and Dr. Bondurant.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one.  This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if substantial evidence supports her factual conclusions.  42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971).

"The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors 'are not medical opinions, . . . but are, instead opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395   F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).   To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In the sequential analysis for a disability claim, the claimant bears the ultimate burden of establishing a disability. *See Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990). In doing so, the claimant must establish the existence of a severe impairment. *See Jackson v. Bowen*, 801 F.2d 1291, 1294 (11th Cir. 1986). "A severe impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities." *Beegle v. Soc. Sec. Admin., Com'r*, 482 Fed.Appx. 483, 486 (11th Cir. 2012) (citing 20 C.F.R. § 404.1521(a)). "An ALJ . . . abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians." *Marybury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1991) (Johnson concurring). However "the finding of any severe impairment . . . is enough to satisfy step two because once the ALJ proceeds beyond step two he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." *Burgin v. Comm'r of Soc. Sec.*, 420 Fed.Appx. 901, 902 (11th Cir. 2011).

Absent a good showing of cause to the contrary, the ALJ must accord substantial or considerable weight to the opinions of treating physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). The ALJ must credit the opinions of treating physicians over those of consulting physicians unless good cause exists for treating the opinions differently. *Lewis v. Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997).

For example, the ALJ may discount a treating physician's report when it is not

accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d at 1159. Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, the ALJ commits no reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant was forty-four years old at the time of the administrative hearing. (R. 75). The claimant has a high school education and has taken some college courses. The claimant's past relevant work includes a patient insurance clerk, route driver, taxi driver, insurance agent, teller, and a customer service representative. (R. 101, 102). The claimant also delivered Yellow Pages telephone books on a part-time basis; however, this position did not amount to substantial gainful activity. (R. 53). The claimant alleges disability commencing on February 1, 2009 based on mitral valve prolapse ("MVP"), high blood pressure, dysautonomia, anxiety, brain surgery, and headaches. (R. 208).

*Physical and Mental Limitations*

From 2005 until 2008, Dr. Clifton A. Latting served as the claimant's primary care physician. On January 12, 2007, Dr. Latting noted that in addition to MVP and dysautonomia, claimant suffered from migraines, an anxiety disorder, hypertension, and weight gain. (R. 283). The claimant visited Dr. Latting's office for treatment of these conditions eight times throughout 2007 and 2008. (R. 274–287).

On August 24, 2009, Dr. Samara diagnosed the claimant with a left orbital ethmoid cyst of unknown etiology. (R. 315).[3] Dr. Latting referred the claimant to Dr. Alan M. Lessner to

---

3 Claimant alleges disability commencing on February 1, 2009 despite not presenting any record—medical or otherwise—on February 1, 2009. (R. 172; 208). In fact, the record is devoid

remove the cyst. On September 30, 2009, Dr. Lessner performed surgery on the claimant and removed the cyst, noting "The patient tolerated the procedure well and was brought to Recovery Room in satisfactory condition." On November 23, 2009, in a post-operation follow-up visit, Dr. Lessner examined the claimant and determined he was "stable" and "well healed." (R. 288–305).

Five months later, on April 30, 2010, the claimant visited his psychiatrist, Dr. Barbara Turner, complaining of a depressed mood. According to the claimant, "the struggles in my life are depressive but I'm not depressed." Dr. Turner diagnosed the claimant with adjustment disorder mixed with anxiety and depressed mood. At the time, the claimant was already taking Enalapril for hypertension, Hydrochlorothiazide for water retention, Metroprolol to control his MVP, potassium for hydration, and Simvastatin for high cholesterol. Moreover, the claimant discussed the negative side effects he experienced in 2005 when his former psychiatrist Dr. Moore, prescribed him Paxil for a depressed mood. Therefore, Dr. Turner recommended the claimant begin individual therapy to control his depression, in lieu of taking any additional medications for his symptoms. (R. 330–32).

Dr. Bondurant, the claimant's therapist, engaged in individual psychotherapy with the claimant from June to August of 2010 at the Birmingham Veterans Administration Hospital. During consultations, the claimant noted a tendency "to get irritable at times but [did not] want to take any medication for it." Moreover, claimant reported "things [were] better in [his] marriage." However, in August 13, 2010, the claimant complained of anger problems, which in his estimation worsened after surgery in August of 2009. Further, claimant was having difficulty managing his surgery recovery, parenting, marital relationship, and college coursework. The

---

of any entry from November 3, 2008 (R. 275) until August 24, 2009. (R. 311). However, because the claimant's disabilities are noted in the record prior to February 1, 2009—in January 2007 (R. 283)—this court finds the claimant's disability onset date proper.

claimant alleged that his anger problems led to interpersonal conflicts, especially with female coworkers who reminded him of his grandmother. Accordingly, Dr. Bondurant referred him to Anger Management Group Therapy. (R. 417–28).

On September 7, 2010, the claimant began Anger Management Group Therapy, which met once a week until October 26, 2010. During Anger Management, Dr. Bondurant noted that the claimant actively engaged in each session. Further, the claimant was responding productively to situations intended to provoke anger. However, the claimant noted, because of a history of interpersonal conflicts, especially with females reminding him of his grandmother, he wanted to avoid group work settings. Nevertheless, after completing Anger Management Group Therapy, the claimant agreed to continue efforts to improve self-care and return to a holiday stress management group therapy session in December of 2010. (R. 391–414).

On October 29, 2010, the claimant presented to his new primary care physician, Dr. Carol E. Cowley, at the VA for medication management, complaining of low mood. Because of the claimant's poor history with Paxil, Dr. Cowley recommended that the claimant take Wellbutrin. After beginning a Wellbutrin regimen, the claimant reported positive results with no adverse side effects. Additionally, the claimant denied headaches, dizziness, or visual disturbances. The claimant noted plans to complete his Associate's Degree and addressed marital strengths and parenting challenges. The claimant also reported feeling calmer, managing stress better, and practicing self-calming techniques learned in Anger Management Group Therapy. (R. 388–96).

On December 22, 2010, the claimant again presented to Dr. Cowley for a routine check-up. Dr. Cowley noted claimant had "no new complaints" except that "he started having left frontal headaches in the region where he had surgery in the past." However, the claimant also indicated that the headaches went away on their own. Nevertheless, Dr. Cowley ordered the

claimant's patient records from his surgery for review and planned a follow-up visit for April 2011. (R. 384–87).

On April 28, 2011, the claimant returned to the VA, seeking a change in his medication from his psychiatrist, Dr. Turner, because his "medication [was] not working anymore." (R. 355). Dr. Turner noted several additional contributing factors to the claimant's stress, including efforts to complete school, expiration of the claimant's unemployment benefits, financial problems, relocation into another home owned by the claimant's mother, and marital issues related to a strained relationship between the claimant's wife and the claimant's mother. Accordingly, Dr. Turner again diagnosed the claimant with adjustment disorder with mixed anxiety and depressed mood, hyperlipidemia, MVP, and generalized anxiety disorder. Moreover, Dr. Turner increased the claimant's Wellbutrin regimen and recommended psychotherapy and marital counseling. The claimant began individual psychotherapy in May of 2011, which continued until February of 2012. (R. 361, 502–561).

Then, on July 7, 2011, at the request of the SSA, Dr. Robert Estock evaluated the claimant for a variety of mental impairments and concluded the claimant had only mild limitations in activities of daily living and social functioning; no limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation. Dr. Estock based his conclusions on a review of the claimant's medical record and a consultation with the claimant. (R. 464–76).

Meanwhile, the claimant continued seeking individual psychotherapy treatment. On November 10, 2011, during one of the claimant's psychotherapy sessions, Dr. Bondurant noted continued stressors in the claimant's life, including the claimant's car had been repossessed; the claimant had flunked out of school; he experienced financial stress, including becoming

unemployed; the claimant lived with his mother; and the claimant continued having health concerns.

At this meeting, and for the first time, Dr. Bondurant reported the claimant's panic attacks. Then, in January 2012, Dr. Bondurant noted the claimant's condition was such as to prevent or substantially reduce his ability to work. However, again, Dr. Bondurant recommended that the claimant continue psychotherapy, stress management, and relaxation therapy. (R. 502–61).

On January 9, 2012, the claimant presented to Dr. Brasher complaining of headaches "like he [had] when they discovered the brain tumor" before his surgery to remove the cyst in September of 2009. (R. 580). Dr. Brasher referred the claimant to Dr. Winfield Fisher III, a neurologist, to monitor the development of a benign cyst below his left eye. However, by May 3, 2012, after a CT scan and an MRI, Dr. Fisher noted "no recurrence of his tumor." (R. 568–687).

Also, on January 19, 2012, the claimant presented to the Mitral Valve Prolapse Center complaining of "stabbing chest pain," "shortness of breath," and "panic attacks." (R. 481).  Dr. Lisa Brasher saw the claimant and noted that, although the claimant was not having seizures, the claimant "has panic attacks, . . . [a] sleep disorder, [and] . . . problems with memory concentration." (R. 481).  Dr. Brasher diagnosed the claimant with hypertension, hyperlipidemia, abnormal echo, major depressive disorder, and chest pain. Further, Dr. Brasher ordered that the claimant begin a Paxil regimen—instead of Wellbutrin—because the claimant "did very well" on a Paxil regimen in the past. The record is unclear, however, whether the claimant complied with this treatment plan. (R. 482).

Then, on July 24, 2012, the claimant underwent another psychiatric review by Dr. Thomas A. Novack at the request of Dr. Fisher. Dr. Novack stated that the claimant's

"[c]ognitive performance was variable across tests, but fell within broad average limits." (R. 636). Additionally, Dr. Novack noted "[i]f only for psychiatric reasons, [the claimant] is not capable of employment at this time." (R. 637).  On the other hand, Dr. Novack noted the claimant's memory, concentration, and mental processing all ranged from average to excellent, and that the claimant's cognitive abilities "should not be a barrier" to employment. (R. 642). Further, Dr. Novack noted "an impression of manipulation" and a "lack of genuineness." (R. 636–43).

On August 13, 2012, Dr. Fisher admitted the claimant to UAB's Epilepsy Center to study whether the claimant's on-going panic attacks were resulting from the benign cyst or had an epileptic origin. Dr. Fisher referenced the claimant's propensity for anxiety and panic attacks, including "dramatic attacks which involve visual hallucination involving a comedy routine with Drew Carey." (R. 655). However, after a three-night stay, Dr. Fisher discharged the claimant, finding it "unlikely that the patient is experiencing epileptic seizures." (R. 655–658).

The claimant returned to Dr. Fisher for a follow-up visit on September 18, 2012. During his visit, Dr. Fisher again witnessed the claimant having a "panic attack/pseudoseizure." However, Dr. Fisher did not diagnose the claimant as having seizures and noted that the claimant was "fine" after taking his medicine. Dr. Fisher advised the claimant to follow-up with his optometrist, Dr. Ray, but did not change the claimant's previous diagnosis or add anything to the claimant's existing treatment/medication plan. (R. 743–44).

*The ALJ's Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits, the claimant requested and received a hearing before an ALJ. (R. 48, 70). During the hearing, the claimant had what appeared to be a panic attack. (R. 83). The claimant's wife was called to

testify to the event and stated that he "started crying, shaking and . . . lost control." (R. 83). Although the claimant could understand the attorneys and the ALJ, the claimant "[c]ouldn't control his movements." (R. 83). The claimant eventually asked to be excused, and the ALJ allowed the claimant's wife to testify on his behalf about her experience with claimant. (R. 81–85).

When the claimant regained his composure, the claimant testified that he was unemployed. (R. 96). Moreover, the claimant testified that he was unable to drive because "two doctors [told him he] shouldn't be driving because of the seizures." However, during a normal day, the claimant testified that he takes care of his children, listens to music, and, overall, "[keeps] the house running."(R. 85–86).

The claimant has previously worked as a patient account representative, a self-employed life insurance agent, a part-time taxi driver, a route salesman, and a teller at Bank of America. (R. 98–100). [4] When asked why he believed he was disabled and unable to work, the claimant responded "I cannot control myself" and "If I try to think I'll have a seizure."[5] (R. 88). The claimant also alleged that he was unable to do "a lot of physical work" like "bending" or "standing," and could not ride elevators too often because "it's like I'm at Six Flag's," seemingly suggesting that the claimant experiences vertigo when traveling up or down. (R. 100–01).

A vocational expert, Ms. Jacobson, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Jacobson testified that the claimant's past relevant work was as a patient insurance clerk, route driver, taxi driver, insurance agent, teller, and a

---

[4] Claimant testified that he worked for a week or two during the summer of 2011, passing out Yellow Pages phonebooks. (R. 96–97). However, the ALJ found "this work does not rise to the level of substantial gainful activity" because he only earned $571.00 in 2011. (R. 53).
[5] However, the claimant's counsel was unable to point to any medical records supporting this assertion and the record lacks any medical instruction claimant not to drive. (R. 86–87).

customer service representative. Ms. Jacobson classified the patient insurance clerk as sedentary with a specific vocational preparation (SVP); the route driver as medium with an SVP; the taxi driver as medium with an SVP; the insurance agent as light with an SVP because he described that job at the sedentary level of exertion; the Teller as light with an SVP; and the customer service representative as light with an SVP. (R. 101–02).

The ALJ asked Ms. Jacobson to assume a hypothetical regarding a person with the same impairments as the claimant, who is limited as follows: the claimant may never balance or climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; must avoid unprotected heights, uneven surfaces, dangerous machinery and commercial driving; can perform goal oriented work; must work in an environment that does not have stringent production or speed requirements; and may have superficial contact with coworkers and supervisors, but no contact with the public. Ms. Jacobson stated that a person with these limitations and requirements could not perform any of the former jobs held by claimant. However, Ms. Jacobson identified other jobs for which the claimant would qualify, including a mail clerk, packing jobs, and a dietary aide worker. (R. 102–03).

The ALJ then asked Ms. Jacobson if this person would be able to perform any other jobs if, in addition to the prior restraints listed, he was required to understand, remember and carry out simple, repetitive tasks; must work in an environment with little change in terms of tools, processes, and settings, and, when necessary, such change must be introduced gradually; and must have supervisors onsite and readily available but not always in the immediate area. Ms. Jacobson responded that the person could perform the same jobs under this second hypothetical as under the first hypothetical. (R. 103).

Finally, the ALJ asked Ms. Jacobson if this person would be able to perform any other

jobs if, in addition to all other prior constraints listed, he was required to occasionally take unscheduled breaks for 15 minutes or more at a time and occasionally would be unable to manage the stresses of work. In this final scenario, Ms. Jacobson responded that "there would be no work" for this third hypothetical individual. (R. 103).

*The ALJ's Decision*

On March 8, 2013, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 48). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2014 and had not engaged in substantial gainful activity since his alleged onset date of February 1, 2009. (R. 53).

Next, the ALJ found that the claimant had several severe impairments, including depression, anxiety, status post left orbital cyst removal with related headaches, and optic nerve edema of the left eye. The ALJ also noted claimant's medical history of hypertension, hyperlipidemia, and mitral valve prolapse, but found that medications controlled these impairments. Moreover, the ALJ found the claimant did not allege any substantial limitations resulting from these conditions, and consequently, found these impairments were not severe. Finally, the ALJ referred to claimant's repeated claims that he suffers from seizures. However, because claimant was never diagnosed with a seizure disorder and no medical record supports his claim, the ALJ found his alleged seizures or pseudoseizures not medically determinable, and, consequently, not severe. (R. 53–54). To the extent claimant suffers from stress related panic attacks or seizures, the ALJ attempted to accommodate such disorders in the residual functional capacity. (R. 54).

The ALJ next found the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416, 925 and 416.926). The ALJ considered whether the claimant met the "paragraph B" criteria. The ALJ determined that, based on the claimant's medical history and his and his wife's testimony at his hearing, the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, and as such, the "paragraph B" criteria are not satisfied. (R. 55–56).

Additionally, the ALJ considered whether the claimant met the "paragraph C" criteria. To meet this criteria, the claimant would have to demonstrate repeated episodes of decompensation, each of an extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the claimant to decompensate; or an inability to function outside a highly supportive living arrangement. The ALJ found none of these criteria present in the record to support a "paragraph C" criteria listing. (R. 56).

Next, the ALJ determined that the claimant had a residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except the claimant may never balance or climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; must avoid unprotected heights and uneven surfaces, dangerous machinery and commercial driving; can perform goal oriented work; must work in an environment that does not have stringent production or speed requirements; may have superficial contact with coworkers and supervisors and no tasks; must work in an environment with little change in terms of tools processes or settings, and, when necessary, such change must be introduced gradually change; must work in an environment where supervisors are on site and readily available but not always in the immediate area; and will be off task 10% of the day. (R. 57).

14

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. The ALJ found that the claimant had greater capabilities than he originally alleged. Specifically, the claimant alleged that he was unable to work because of his physical and mental impairments. The claimant testified that he is unable to concentrate; he must stay calm, or else would have a seizure; he has anger problems; and he has trouble bending, standing, and getting on elevators. However, the ALJ found the claimant's testimony undermined by his prior inconsistent statements and a history of failing to follow a prescribed treatment plan. For example, the claimant testified that he watches his children and keeps his house running. The ALJ determined that this testimony was inconsistent with his testimony that he could not bend, stand, or get on elevators. Moreover, a review of his medical record revealed that the claimant often refused medication or failed to attend mental health programs. Consequently, the ALJ determined that the claimant's subjective allegations of his symptoms and abilities were not fully credible. (R. 57–61).

The ALJ gave little weight to Dr. Robert Estock's consulting opinion regarding the claimant's mental impairments. Dr. Estock estimated that the claimant only had mild limitations in activities of daily living and social functioning; no limitations in concentration, persistence, or pace; and no episodes of decompensation of an extended duration. While conceding that Dr. Estock's opinion supports a finding of "not disabled," the ALJ looked to other evidence in the medical record that supported his decision. For example, although the ALJ discounted Dr. Novack's opinion regarding the claimant's overall condition, the ALJ gave substantial weight to

15

Dr. Novack's opinion that indicated the claimant suffered from concentration, persistence, or pace limitations. Additionally, the ALJ noted some limitations in social functioning by reference to claimant's poor record in Anger Management therapy sessions. Accordingly, the ALJ concluded that some mental impairment limitations were reasonable. (R. 61).

However, as mentioned previously, the ALJ gave little weight to Dr. Novack's and Dr. Bondurant's opinions that that claimant's condition was such as to prevent or substantially reduce his ability to work even part time. The ALJ first gave their opinions little weight because he found that a determination of whether the claimant is capable of work to be one reserved for the Commissioner. (R. 61). Moreover, the ALJ found their opinions inconsistent with the medical record, the claimant's testimony regarding his daily activities, and with Dr. Novack's and Dr. Bondurant's own findings. She pointed to medical records and the claimant's testimony regarding his daily activities that show the claimant was able to attend school, care for his children, and had an optimistic outlook about his future. Moreover, the ALJ stated that, while both Dr. Novack's and Dr. Bondurant's treatment notes indicate moderate workplace limitations, neither indicated a complete inability to work. (R. 61–62).

Finally, the ALJ found that the claimant was incapable of performing hisr past relevant work as a patient insurance clerk, route driver, taxi driver, insurance agent, teller, or customer service. The ALJ relied on the testimony of the vocational expert at the ALJ hearing to find that the claimant could perform the requirements of a mail clerk, packing, and dietary aid worker, all of which are jobs that exist in significant numbers in the national economy. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 62–63).

## VI. DISCUSSION

The claimant argues that the ALJ improperly failed to find the claimant's alleged seizure activity to be a severe impairment and that the ALJ erred in the weight she gave to the claimant's treating and consultative physicians. To the contrary, this court finds that substantial evidence supports the ALJ's decision and that the ALJ applied the appropriate legal standards to her evaluation of the claimant's severe impairments and in forming her RFC for the claimant.

*Issue 1: The ALJ's Determination of Claimant's Severe Impairments*

The claimant argues that the ALJ improperly discredited the claimant's alleged seizure disorder. Specifically, the claimant argues that the ALJ made a medical judgment that the claimant did not suffer from an alleged seizure disorder. To the contrary, this court finds that the medical record supports the ALJ's decision that the claimant's alleged seizure disorder is not medically determinable.

In this case, the ALJ properly considered the medical record and determined that claimant's alleged seizure disorder was not medically determinable. Although the claimant alleges that he suffers from a seizure disorder making him unable to concentrate, the claimant's attorney at the hearing and in his brief was unable to point to any medical record supporting the claimant's alleged seizure disorder.

Additionally, the ALJ found that the medical records told a different story as well. In January 2012, Dr. Brasher referred claimant to Dr. Fisher, a neurologist, to study his alleged panic attacks and seizures. After a three-night stay at UAB's Epilepsy Center, Dr. Fisher concluded that it was "unlikely that the [claimant] is experiencing epileptic seizures." (R. 655–58). Moreover, the record indicates that Dr. Fisher witnessed one of claimant's alleged panic attacks / seizures and still concluded that claimant was "fine" after medication. (R. 743).

17

Accordingly, the ALJ determined that the residual functional capacity supported the objective medical evidence. Because the ALJ did not substitute her own judgment for that of the medical record, she did not abuse her discretion. *Marybury*, 957 F.2d at 840.

Finally, even if the ALJ erred in refusing to include claimant's seizure disorder as a severe impairment, such error is harmless. Once an ALJ finds *any* severe impairment, such a finding is sufficient to move from step two of the sequential analysis to step three. *See Burgin*, 420 F. App'x. at 902. In this case, the ALJ found that the claimant suffered from several severe impairments, including depression, anxiety, status post left orbital cyst removal with related headaches, and optic nerve edema of the left eye. Thus, the ALJ made no error in failing to find the claimant's alleged seizure disorder a severe impairment. Moreover, the ALJ appropriately considered the effects of claimant's alleged seizure disorder when conducting her RFC analysis.

Accordingly, the court finds that substantial evidence supports the ALJ's determination that the claimant's alleged seizure disorder was not medically determinable. Because the ALJ found that substantial evidence supported the determination that the claimant had other severe impairments, the ALJ properly moved to the next step in the disability sequential analysis and applied the proper legal standards.

*Issue 2: The ALJ's Assessment of the Treating and Consultative Physician Opinions*

The claimant next argues that the ALJ failed to accord proper weight to the opinions of the Dr. Estock, Dr. Novack, and Dr. Bondurant. This court finds that the ALJ properly articulated her reasons for discrediting the opinions of Dr. Estock, Dr. Novack, and Dr. Bondurant, and that substantial evidence supported these reasons.

The ALJ clearly articulated her reasons for discrediting the opinion of Dr. Estock, even though doing so actually favored the claimant. Here, the ALJ gave little weight to Dr. Estock's

opinion that the claimant only had mild limitations in activities of daily living and social functioning; no limitations in concentration, persistence, or pace; and no episodes of decompensation of an extended duration. Instead, the ALJ's pointed to Dr. Novack's opinion that indicated the claimant had some concentration, persistence, or pace limitations. Moreover, the ALJ correctly found that Dr. Estock's findings conflicted with other evidence in the record, such as the claimant's poor record in Anger Management therapy sessions, which indicate limitations in social functioning. Therefore, because the ALJ specifically stated her reasons for failing to give substantial weight to Dr. Estock and those reasons are supported by the medical record, this court finds that the ALJ did not commit error.

The claimant also contends that the ALJ erred in discounting Dr. Novack and Dr. Bondurant's opinions regarding the claimant's ability to work. The claimant points to Dr. Novack's opinion that "[i]f only for psychiatric reasons, [the claimant] is not capable of employment at this time." (R. 637). Additionally, the claimant notes that Dr. Bondurant believed that the claimant's condition was such as to prevent or substantially reduce his ability to work even part time. (R. 61).

An ALJ may refuse to give controlling weight to a treating physician if the ALJ articulates specific reasons for doing so and substantial evidence supports those reasons. *Moore*, 405 F.3d at 1212.  Here, the ALJ specifically articulated that she gave their opinions little weight because they were opinions inconsistent with the medical record, the claimant's testimony regarding his daily activities, and with Dr. Novack's and Dr. Bondurant's own findings. First, substantial evidence from the medical record supports the ALJ's decision on the weight she afforded to both Dr. Novack and Dr. Bondurant. The ALJ noted that the claimant has suffered from a variety of impairments, but that they are all controlled with treatment. For example, the

claimant was diagnosed with depression and anxiety as early as 2007. However, with individual and group therapy and a prescription for Paxil or Wellbutrin to combat his symptoms, the ALJ found the claimant is capable of living a normal life. Further, the ALJ notes that the claimant suffers from panic attacks. However, the ALJ indicated that several doctors linked claimant's symptoms to stressors in his life, including efforts to complete school, expiration of claimant's unemployment benefits, financial problems, relocation into another home owned by claimant's mother, and marital issues related to a strained relationship between claimant's wife and claimant's mother. Moreover, the ALJ pointed to Dr. Fisher's notation that even if the claimant suffered from panic attacks, he was "fine" after taking his medication. Finally, the ALJ noted that the claimant also suffers from headaches, which he claims resulted from a surgery to remove an orbital cyst in 2009. However, the objective medical evidence supports the ALJ's finding that the claimant's headaches are treatable and often subside on their own.

Second, the ALJ pointed to the claimant's own testimony that contradicted Dr. Novack and Dr. Bondurant's opinions regarding claimant's ability to work. At the hearing, the claimant testified that during a normal day, he takes care of his children, listens to music, and "[keeps] the house running." As the ALJ properly notes, performing these activities is inconsistent with the claimant's testimony that he is unable to work.

Finally, the ALJ properly discredited Dr. Novack and Dr. Bondurant's opinions regarding the claimant's inability to work based on Dr. Novack's and Dr. Bondurant's own findings. Dr. Novack noted that the claimant was unable to work for psychiatric reasons. However, Dr. Novack also claimed that claimant's cognitive abilities "should not be a barrier" to employment and that claimant often exhibited "an impression of manipulation" and a "lack of genuineness." Moreover, Dr. Bondurant opined that claimant's condition was such as to prevent or

20

substantially reduce his ability to work even part time. However, the ALJ correctly states that Dr. Bondurant's treatment notes indicate no inability to work. Accordingly, because substantial evidence from the medical record supports the ALJ's decisions, this court finds that the ALJ did not commit error and that the ALJ followed the proper legal standards.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision and that she applied the proper legal standard. Accordingly, this court AFFIRMS the decision of the Commissioner.

The court will enter a separate Order to that effect simultaneously.

**DONE** and **ORDERED** this 8th day of March, 2016.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE